IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alicia Valenzuela, | ) No. CV 06-249-TUC-FRZ (HCE) |
| Plaintiff, | ) **REPORT & RECOMMENDATION** |
| vs. | ) |
| Michael J. Astrue,[1] Commissioner of Social Security, | ) |
| Defendant. | ) |

On May 19, 2006, Plaintiff filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  On that same date, Plaintiff's case was referred to the undersigned Magistrate Judge for a Report & Recommendation pursuant to the Rules of Practice of this Court.

Pending before the Court are Plaintiff's Motion for Summary Judgment and (hereinafter "Plaintiff's MSJ") and Defendant's Cross-Motion for Summary Judgment (hereinafter "Defendant's XMSJ").  For the following reasons, the Magistrate Judge

---

[1] On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as the defendant in this action.

recommends that the District Court grant in part and deny in part Plaintiff's MSJ, deny Defendant's XMSJ, and remand this matter for further proceedings.

I.      PROCEDURAL HISTORY

On September 3, 2003,[2] Plaintiff submitted to the Social Security Administration (hereinafter "SSA") an application for supplemental security income under Title XVI of the Social Security Act alleging inability to work since July 1, 1998 due to inability to lift, diabetes, fatigue, "a bad disc" in her lower back, and numbness in her hands and arms. (TR. 97-99, 102) Plaintiff's application was denied initially and on reconsideration. (TR. 57, 64, 67)

Plaintiff then requested a hearing before an administrative law judge (hereinafter "ALJ") and the matter was heard on May 6, 2005 by ALJ Lauren R. Mathon.  (TR. 71, 468-499) Plaintiff, who was represented by counsel, testified at the hearing in addition to Irvin Belzer, M.D., who testified as a medical expert.  (TR. 468-499)   On August 16, 2005, subsequent to considering a doctor's report submitted by Plaintiff after the hearing, the ALJ denied Plaintiff's application.   (TR. 28–35) Thereafter, the Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's August 16, 2005 decision the final decision of the Commissioner. (TR. 5-7, 22) Plaintiff then initiated the instant action.

II.     THE RECORD ON APPEAL

A.      Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on April 21, 1956.  (TR. 97)  At the time of the hearing, she lived with her boyfriend who was soon moving to Texas.  (TR. 497)

Plaintiff completed school through the tenth grade.  (TR. 106, 483)  Plaintiff's work history includes employment as an in-home caregiver to the elderly from 1985 through April 14, 2000. (TR. 103) She also worked a few months in 2002 at a restaurant.  (TR. 493) From

_____

[2]The record reflects a protective filing date of July 16, 2003.  (TR. 100)

July 1, 1999 through July 2004, she took care of her boyfriend's elderly mother.  (TR. 493-496)

Plaintiff's previous work as a caregiver from 1985 through 2000 involved lifting 100 pounds or more as she provided personal care for her charges. (TR. 103-104)   She experienced pain caused by lifting trays and buckets for dishes when working at the restaurant.  (TR. 493) She was ultimately fired from her job at the restaurant because of absences due to illness.  (Id.)  Caring for her boyfriend's mother, Mrs. Hamilton, involved washing her clothes, preparing meals and driving her to nearby doctor's appointments. (TR. 495) Plaintiff's boyfriend drove his mother to appointments that were farther away.  (Id.)

Plaintiff stated that she was unable to work because of fibromyalgia, swelling and pain in her arms; pain between her shoulder blades and neck; pain in her lower back that runs down her right leg; numbness in her right leg, arms and hands; and fatigue (TR. 103, 131, 484)  Plaintiff stated that she experiences a shooting pain in her right hip and leg when she is sitting or driving. (TR. 484, 113) Her hands and fingers become painfully numb while driving or holding a phone.  (TR. 484-485, 113) The pain and numbness keeps her from sleeping through the night. (TR. 136-137, 485) In 2004 she reported that she was awake every one and one-half hours through the night.  (TR. 136) She experiences fatigue, falls asleep during the day, has difficulty breathing, and has gained more than 50 pounds in the last few years.  (TR. 475, 486) She has fallen asleep while riding in cars and at the table. (136-137)  She also has memory problems, is absent minded, and forgets things.  (TR. 114, 131, 486)

On most days, Plaintiff experiences pain at a level of 8 on scale from zero to ten with ten being the worst pain imaginable.  (TR. 486) Her pain is exacerbated by lifting "anything of four to six pounds" as well as a six-pack of soda or a gallon of milk.  (Id.) Most of her day is spent lying down which helps with the pain.  (TR. 487) She feels discomfort sitting.  (TR. 489) She experiences swelling in her legs and feet if she stands for long periods.  (Id.) She has pain walking.  (Id. ) Plaintiff walks to the mail box and around the house.  (TR. 491-492)

Side effects from her medications include constipation, fatigue, loss of memory, depression, and difficulty driving.  (TR. 488)

On a typical day, Plaintiff has to wait about an hour after rising for the numbness and swelling in her arms and hands to subside before she can prepare breakfast.  (TR. 112, 484) Because of the numbness she often requires assistance carrying things to the table and with buttons and zippers.  (TR. 112, 137) She does her own cleaning and laundry but does not do yard work.  (TR. 113) Although she goes to the grocery store, she requires assistance loading the car.  (TR. 113) She spends most of the day in bed.  (TR. 114, 125) Her constant pain and fatigue make it difficult to do house work or small chores.  (TR. 135)

B.    Medical Evidence

1.    Plaintiff's Treating Physicians

A May 11, 1999 radiology report of views of Plaintiff's cervical spine denoted "mild spondylosis at C6-7.  No other significant abnormality is seen....There is no compression deformity...."   (TR. 384) Views of Plaintiff's thoracic spine denoted "[m]ultilevel degenerative disc disease and anterolateral spurring....No compression deformity...."  (Id.)

A February 26, 2001 MRI of Plaintiff's thoracic spine denoted "[t]iny focal right paracentral disc protrusions...at T1-T2 and T5-T6 interspace levels, potentially representing tiny herniations.  The clinical significance of both findings is uncertain, as no significant central spinal canal stenosis or mass impression upon the thoracic cord is present based upon patient positioning during scanning....No significant central spinal canal stenosis is seen throughout."  (TR. 216) "Incidental note" was made of "potential right posterolateral disc herniation at C6-C7" and further evaluation was recommended.  (Id.)

A March 19, 2001 MRI of Plaintiff's cervical spine denoted a "small right paracentral disc herniation at C6-C7 level which appears to...minimally impress upon the right anterolateral aspect of the right cervical cord" and "[p]ossible right paracentral disc herniation" at the T2-T3 level.  (TR. 215)

- 4 -

In October 2001, Donald R. Smith, M.D., assessed Plaintiff with acute anxiety, diabetes mellitus, muscle spasms, and chronic back pain.  (TR. 421) He prescribed oxycontin, lorezepam for anxiety, paxil and he recommended counseling which Plaintiff declined.  (Id.)  Through May 2002, Plaintiff received refills of pain medication including oxycontin and percocet.  (TR. 417-420)

On May 28, 2002, Plaintiff saw Audrey I. Russell-Ruben,[3] FNP-C, who worked at the same clinic as Dr. Smith.  (TR. 414) Plaintiff complained of back spasms. (Id.) The diagnosis was chronic back pain and ms contin was prescribed.  (Id.)

On June 13, 2002, Dr. Smith prescribed ms contin for Plaintiff's complaints of chronic pain.  (TR. 404)

Also in June 2002, Plaintiff presented to FNP-C Russell-Ruben complaining of back pain, depression and low self esteem.  (TR. 403) FNP-C Russell-Ruben diagnosed chronic depression, type II diabetes, and chronic back pain.  (Id.)  She advised Plaintiff to see a counselor.  (Id.)  In July 2002, FNP-C Russel-Ruben prescribed ms contin, MSIR, and wellbutrin.  (TR. 214) By August 2002, FNP-C Russell-Ruben found that Plaintiff's depression was "improved" and her chronic back pain was under "good control."  (TR. 211)

On October 3, 2002, Dr. Smith saw Plaintiff regarding complaints that her legs were swelling and that she had fallen and hurt her shoulder.  (TR. 209) He assessed chronic neck pain, "known cervical disc [illegible]", history of anemia, diabetes under control, depression and anxiety. (Id.)  He noted that Plaintiff had not adhered to medical recommendations. (Id.) He prescribed celexa and MSIR.  (Id.)  After testing, Dr. Smith determined that Plaintiff continued to suffer from anemia due to a chronic blood iron deficiency and she had a pelvic mass.  (TR. 206, 207) He prescribed a multivitamin and a pelvic ultrasound.  (Id.)

---

[3]FNP-C Russell-Ruben's name subsequently changed to Audrey Russell-Kibble. (*See* TR. 188)

On October 24, 2002, Plaintiff presented to Dr. Smith complaining of severe back pain, a feeling of fire in both arms, and nausea. (TR. 206) He assessed diabetes mellitus under "good control", anemia, left ovarian mass, fibroid uterus, and chronic pain. (Id.) He prescribed nausea medication and oxycodone. (Id.)

In November 2002, Plaintiff had a hysterectomy for a benign uterine mass. (TR. 199, 202, 254-256) Through the end of 2002, she continued on ms contin and MSIR and began taking hormone replacement medications. (TR. 200-202)

In January 2003, Dr. Smith noted Plaintiff's request for increased pain medication. (TR. 199) Dr. Smith's treatment note also indicates that he has had "multiple discussions in the past" with Plaintiff "about not abusing pain medication" and that she must take the medication as directed. (Id.)

> The patient states that the medications are making her sick and throw-up and she wants to get off them anyway. She has known fairly serious disc disease in her neck and her low back. ..today she is developing numbness and electrical pain which radiates down the lateral side of her right leg...She does have a known reason for back pain....

(Id.) Dr. Smith assessed diabetes mellitus and

> [k]nown cervical and lumbar disc disease. The patient is having chronic pain from these, although, she is extremely non-compliant with following the contracts for pain medication. Her nausea may be more related to drug withdrawal than the nauseating effect of the narcotic itself.

(Id.) Dr. Smith discontinued all morphine products and prescribed a trial of methadone in addition to phenergan for nausea. (Id.) He also ordered a CT scan of the "LS spine." (Id.)

In February 2003, Plaintiff presented with complaints of hand pain. (TR. 195) Dr. Smith assessed bilateral hand pain triggered by grasping and gripping. (Id.) Plaintiff was advised to discontinue grasping and gripping and not to lift more than ten pounds. (Id.) Voltarin and methadone were prescribed. (Id.)

In March 2003, Plaintiff was seen by a medical provider at United Community Health Center[4] whose name is illegible.  (TR. 194) Plaintiff complained of thumb pain.  (Id.) Assessment was diabetes mellutus, thumb pain, menopausal syndrome, and fibromyalgia. (Id.)  Plaintiff's methadone prescription was refilled and an X-ray of Plaintiff's thumb was ordered. (Id.)

On September 23, 2003, FNP-C Russell-Kibble wrote that Plaintiff "suffers from a wide variety of Chronic and Current Diagnoses that prevent her employability at this time..." and that "she may be unable to seek gainful employment again."  (TR. 187) FNP-C Russell-Kibble indicated that Plaintiff suffered from the following "Chronic Illnesses:" fibromyalgia, "Chronic Upper Back and Neck Pain due to a Herniation in the Thoracic and Cervical Spines.  These also cause her to have numbness and tingling and pain in her arms and hands: No lifting or carrying over 7 lb."; chronic low back pain with muscle spasms; and depression. (Id.)  Plaintiff's current contributing diagnoses included "Diabetes mellitus: good control with diet, and medication: Fatigue" and "Splenomegaly: No lifting."  (Id.)

Records from United Community Health Center through November 2003 reflect that Plaintiff continued on methadone for pain, back spasms, and numbness in her hands and arms.  (189-193, 265, 396) On November 13, 2003, Plaintiff presented with complaints of hot flashes.  (TR. 395) On November 14, 2003, she complained that her "emotions" were "off the wall".  (Id.)  She received counseling for thirty minutes.  (TR. 186).  She was assessed with menopausal syndrome, anxiety, insomnia, and chronic pain.  (Id.)  She was prescribed estrogen, celexa and a refill of methadone.  (Id.)

On follow-up appointments through February 3, 2004 at United Community Health Center, Plaintiff continued to complain of back pain.  (TR. 325, 320) Assessment denoted

---

[4]United Community Health Center is the same clinic where Dr. Smith and FNP-C Russell-Ruben treated Plaintiff.

chronic back pain, in addition to other diagnoses.  (Id.) Plaintiff continued on methadone. (Id.)

On February 10, 2004, FNP-C Russell-Kibble diagnosed asthma in addition to edema and current back pain.  (TR. 319) She prescribed KCL, cyclobenzithone, and albutorol.  (Id.)

On February 10, 2004, FNP-C Russell-Kibble completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) wherein she indicated that Plaintiff: could not lift or carry because such actions cause increased back pain, and numbness, tingling, and swelling in the hands; could not grasp with her hands; can stand and/or walk less than 2-hours in an 8-hour workday due to pain in her right leg, hip numbness and "frequent edema"; could not sit "even 10 [minutes] because of leg pain"; and must alternate between sitting and standing.  (TR. 317-318)  FNP-C Russell-Kibble based her conclusions on findings of "numbness, pain and swelling: unable to get relief except for very short periods of time–always <20 [minutes]."  (TR. 318) Plaintiff should never climb, balance, stoop, kneel, crouch, or crawl.  (Id.)  She was limited in reaching, handling, fingering, feeling, and seeing.  (Id.)  FNP-C Russell-Kibble based these restrictions on the finding that Plaintiff experiences back pain, numbness and tingling with all movement and "can see some distance: blurry [with] close."  (Id.)  Plaintiff was also restricted regarding heights, moving machinery, temperature extremes, chemicals, and dust due to "restrictions [with] movements and" patient history, fibromyalgia and allergies.  (Id.) Plaintiff's diagnoses were chronic back pain, fibromyalgia, diabetes mellitus type II, and chronic anemia.  (Id.)

A February 11, 2004 CT scan of Plaintiff's lumbar spine denoted mid-lower lumbar discogenic and hypertrophic facet degeneration; moderate localized central canal stenosis, L3-L4 and L4-L5 levels; and severe bilateral neural foraminal stenosis L5-S1.  (TR. 357) The results were "[e]xtremely limited" due to computer noise secondary to patient's physique.  (Id.)  An MRI was recommended.  (Id.)

On March 16, 2004, Plaintiff under went a series of MRIs of her spine.  (TR. 310-312) The MRI of Plaintiff's lumbosacral spine denoted: small to small-moderate herniated disk in the midline and to the right at T12-L1; mild to moderate stenosis at L3-L4 and L4-L5; and mild stenosis at L5-S1.  (TR. 310) The MRI of Plaintiff's thoracic spine denoted a "small to small-moderate herniated disk towards the right T2-T3," which "is difficult to visualize on the axial images."  (TR. 311) The MRI of Plaintiff's cervical spine denoted a "moderate to moderate-large herniated disk towards the right at C6-C7 with significant pressure upon the thecal sac" which was "slightly more prominent" than it appeared on a March 2001 MRI.  (TR. 312)   "The cervical spinal cord itself is normal."  (Id.)

On March 23, 2004, FNP-C Russell-Kibble completed a Medical Work Tolerance Recommendations form indicating that since July 2003 Plaintiff could not perform work in any work category ranging from heavy to sedentary; could stand, sit, and or walk for only 5 minutes at a time for a total of .12 hours  each and she would need to change positions frequently; could not use her feet, climb stairs or ladders, or drive or ride in a car for any amount of time; would be expected to miss an average of 20 workdays per month; should avoid bending, crouching, kneeling, squatting, sitting in a clerical position, reaching above shoulder level and working with her arms extended in front; is restricted in using her hands and arms and should avoid power gripping, pushing, and pulling and only occasionally pinch, engage in small movements necessary for typing or small assembly and feeling or touching; and should also avoid extreme heat and cold, sudden temperature or humidity changes, exhaust, fumes, smoke, dust, strong odors, unprotected heights, and moving machinery. (TR. 305-306)

From March 2004 through October 2004, Plaintiff continued treatment with FNP-C Russell-Kibble and Dr. Smith who continued to note Plaintiff's complaints of back pain and diabetes, among other ailments, and prescribed medications including methadone, percocet, cyclobenzeline, diclofenac, flexeril, and lasex.  (*See* TR. 307, 450) During that time, in August 2004, Plaintiff saw Eugene Y. Mar, M.D. of Tucson Orthopaedic Institute, on referral

from Dr. Smith's office.  (TR. 428) Dr. Mar's impression was C6-7 disc herniation; T2-T3 bulging disc; L3-4 moderate central spinal stenosis; and L4-5 and L5-S1 mild central spinal stenosis.  (TR. 431) He recommended physical therapy twice a week for four weeks and follow-up with Dr. Smith for pain medication.  (Id.)  According to Dr. Mar, Plaintiff "has multiple areas of abnormality of her cervical, thoracic and lumbar spine."  (Id.)  He opined that Plaintiff "is not a good surgical candidate.  It does not appear that she has any compression that would be amenable to surgical remediation....She has some degenerative disc with bulging at T2-T3 and she has some spinal stenosis of the lumbar spine, but at this point it does not really appear to be surgical."  (TR. 431-432) He encouraged Plaintiff to lose weight, and if after losing weight she "had severe, unremitting pain, then consideration would be given for further evaluation and treatment recommendations."  (TR. 432)

On October 7, 2004, Dr. Smith completed a physical examination report wherein he indicated in pertinent part that Plaintiff "is reliable only to a point.  She exaggerates [sic] a lot –but does have problems.  Chronic low back pain, numbness in upper extremities and arm pain."  (TR. 358) He stated that Plaintiff was unable to work due to "multiple levels of cervical, thoracic and lumbar disk/spine disease...diabetes...hypertension."  (Id.)  She had normal range of motion in her spine except that she had decreased extension in the cervical spine.  (Id.) Dr. Smith opined that Plaintiff: could lift less than 10 pounds, could stand and/or walk at least 2 hours but less than 6 hours in an 8-hour work day due to right leg pain and numbness and severe edema; could sit less than 6 hours in an 8-hour work day; must alternate between standing and sitting every 30-60 minutes and a brief position change for 15 minutes would provide sufficient relief[5]; should never climb, balance, kneel, crouch or crawl due to multi-level disc disease; could occasionally stoop and reach due to multi-level disc disease; could frequently handle, finger, feel and grasp due to multi-level disc disease;

_____

[5]Dr. Smith cited Plaintiff's lumbar disc disease as the reason for limitation with regard to sitting and standing.

and Plaintiff should not work around heights, moving machinery, extremes in temperature, dust, fumes or gases due to mild asthma, diabetes, poor balance, disc disease, obesity, and hypertension.  (TR. 361-363)

On November 17, 2004, Dr. Smith summarized Plaintiff's ailments as borderline diabetes mellitus, significantly overweight, hyperlipidemia, hypertension, and "chronic pain due to both diffuse myalgias, most likely fibromyalgia, and diffuse cervical thoracic and lumbar disc disease", and spinal stenosis.  (TR. 385) Citing Plaintiff's MRIs, Dr. Smith opined that Plaintiff had diffuse disc dehydration and degeneration.  (Id.)   "She is not felt to be a surgical candidate for any of these lesions."  (Id.) On exam, Plaintiff had "fairly normal" strength range of motion and sensation of all extremities.  (Id.)

> She has decreased extension in her cervical spine, otherwise, fairly normal flexion extension and rotation of the thoracic and lumbar spine.  These, however, are painful at extremes.  She has difficulty keeping her balance and has much difficulty bending over or squatting....Her exam, although fairly normal, is somewhat difficult as the patient has a long history of overstating real problems and exaggerating to an unrecognizable point.  It is usually that she does in fact have the problem, but that she over states her symptoms and exaggerates her reactions when it comes to pain.  She takes Methadone at 100 mg a day to help control her chronic pain.

(Id.) Dr. Smith indicated that Plaintiff also takes diclofenac, lasix, potassium, glyburide, and she "needs to use albuterol and Flovent inhalers at times for asthma....She should... not be exposed to fumes or dusty environments or cold environments which could exacerbate her asthma.  She would be unable to perform mental functions which require high levels of concentration because the methadone definitely slows her thinking."  (TR. 386) Dr. Smith's "general assessment" was that

> she certainly has some level of disability due to diffuse degenerative disc disease, her obesity, borderline diabetes, chronic pain, and the medications require [sic] to treat it.  Also, she has minor asthma which limit [sic] her ability to be exposed to dust.  Mentally, she is an emotional person who is prone to exaggerate.  On the other hand, she always has the actual problem and does not make up problems.  Given her multiple limitations, both physical, emotional, mental, and medications, it is hard for me to imagine a job for which she could sustain over a long period of time. I, therefore, do strongly support her claim for at least partial, if not total disability.

(Id.)

On February 21, 2005, Plaintiff saw neurologist Carol L. Henricks, M.D., on referral from Dr. Smith.  (TR. 425) Dr. Henricks concluded that Plaintiff had significant multi-level disc disease associated with radicular symptoms, "[h]owever  she is too obese to undergo surgery at this time."  (TR. 427) She discussed weight loss and pain management with Plaintiff.  (Id.)

On May 26, 2005, after the hearing before the ALJ, Dr. Smith indicated that Plaintiff's

MRI does demonstrate that she has a moderately large herniated disc at the cervical C6 level with significant pressure on thecal sac.  She also has a small to moderate herniated disc at the T2/T3 level.  She has diffuse disc dehydration and degeneration in the thoracic spine.  CT scan of the lumbar spine in February 2004 shows lumbar discogenic hypertrophic facet degeneration and moderate central canal stenosis at L3/L4 and L4/5 and severe bilateral foraminal stenosis at L5/S1.  MRI of the same areas, however, states that the L5/S1 is mild stenosis but still has neuroforaminal impingement.  There is T12-L1 disc herniation, L3/4 and L4/5 mild to moderate stenosis which may be congenital.  Although, some patients have these findings with no pain, her diffuse findings are consistent with her chronic pain syndrome.
It would not be reasonable to conclude that with her diffuse, rather significant disc disease, that she should have no pain–that really is unrealistic.

(TR.  462) Dr. Smith pointed out that Plaintiff also suffers from "other fairly significant medical problems including hypertension, diabetes, smoking with asthma and now has some ongoing abdominal pian issues with a history of enlarged spleen."  (Id.)  He confirmed his earlier conclusion that Plaintiff's physical and mental conditions render her unable to perform most jobs.  (Id.)

2.      State-Agency Physicians

a.      Examining Physicians

On December 5, 2003, Plaintiff was evaluated by Licensed Psychologist Eugene Campbell, Ph.D., for a disability evaluation.  (TR. 266-271) Plaintiff complained of numbness, pain, depression, fatigue, crying easily, feeling worthless, irritability and poor memory.  (TR. 266-267) She stated that she "loses muscle power when she takes anti-depressant medications."  (TR. 266)  She has tried Prozac.  (Id.)

Dr. Campbell found that Plaintiff was mildly depressed as a result of her pain. (TR. 268)  She had no problems with memory.  (Id.) Plaintiff can concentrate for two hours at a

time on simple detailed tasks although "[p]ain interferes at times." (Id.) She had adequate judgment and could make simple and detailed work related decisions. (TR. 269) "With treatment, the prognosis is good for a reduction of depressive symptoms within the next year." (Id.) Dr. Campbell's diagnosis was: major depressive disorder, single episode, mild; herniated discs, fibromyalgia; and stressors of poverty, unemployment, and chronic pain. (Id.)

Dr. Campbell completed an assessment of Plaintiffs's ability to do work-related activities (mental) wherein he indicated that Plaintiff's capability to perform mental demands of work was either "unlimited/very good" or "good limited but satisfactory." (TR. 270-271)

b.     Nonexamining Physicians

1.     Physical

On December 23, 2003, Dr. Fernando Gonzales-Portillo completed a Physical Residual Functional Capacity Assessment wherein he indicated that Plaintiff: could lift 20 pounds occasionally and 10 pounds frequently; could stand about 2 hours in an 8-hour work day; could sit about 6 hours in an 8-hour workday; was unlimited in pushing and/or pulling; could never climb ladders, ropes or scaffolds; could occasionally climb ramps and stairs, stoop, balance, kneel, crouch and crawl; should avoid concentrated exposure to hazards such as machinery and heights, otherwise she had no environmental limitations. (TR. 291-294; *see also* Plaintiff's Statement of Facts (hereinafter "PSOF" ) p.4)) Dr. Gonzales-Portillo also found no manipulative limitations. (TR. 293) To support his conclusion, Dr. Gonzales-Portillo cited Plaintiff's chronic low back and neck pain, fibromyalgia, fatigue, hypertension, diabetes, improving anemia, small right parecentral disc herniation at C6-7, and that she currently takes methadone. (TR. 291-292)

On August 9, 2004, Dr. Robert Estes completed a Physical Residual Functional Capacity Assessment form wherein he indicated that Plaintiff: could lift 20 pounds occasionally and 10 pounds frequently; could stand about 2 hours in an 8-hour work day; could sit about 6 hours in an 8-hour workday; was unlimited in pushing and/or pulling; could

occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds; could frequently stoop and balance; could occasionally kneel, crouch and crawl; should avoid concentrated exposure to extreme heat and cold, fumes, odors, dusts, gases, poor ventilation, and machinery; and should avoid all exposure to extreme heights.  (TR. 364-369) Dr. Estes found that Plaintiff had no manipulative limitations.  (TR. 368) He noted that that Plaintiff's records showed her high blood pressure, diabetes, anemia, fibromyalgia, and asthma were under good control.  (TR. 370) He found Plaintiff to be "less than credible as degree of [symptoms] are not consistent" with the medical evidence given that the MRI and x-rays show "only mild lumbar, cervical spinal changes" and Plaintiff's reports she is able to do light household chores, drive, cook and shop.  (Id.)  Citing Plaintiff's statement of daily activities and examination records showing she had normal strength and sensation in all extremities and normal range of motion of all extremities, Dr. Estes disagreed with Dr. Smith's recommendation of sedentary function with restrictions on reaching and sitting.  (TR. 371) Dr. Estes also disagreed with prior opinions dated September 23, 2003, February 10, 2004, and March 23, 2004 which reflected that Plaintiff was more restricted than his determination because those recommendations were not consistent with the medical evidence, including MRIs and x-rays "showing only mild degeneration" and because Plaintiff reported that she was able to do household chores, drive, and cook.  (Id.)

In May 2005, Irvin Belzer, M.D., testified as a medical expert at the hearing before the ALJ.  (TR. 471-483) Dr. Belzer, testified that although Plaintiff suffered from several illnesses, "most of them did not come up as an impairment."  (TR. 473) He found no medical support for Plaintiff's diagnosis of fibromyalgia.  (Id.) Her diabetes was under control and did not result in complications that usually lead to an impairment.  (Id.) The finding of asthma was not supported by pulmonary function tests or treatment history.  (TR. 473-474) He pointed out that the MRI supported findings of herniated discs with no evidence of nerve root or spinal cord compression and no associated muscle weakness or muscle atrophy.  (TR. 474, 476)  He also indicated that Plaintiff had significant obesity. (TR. 476)

According to Dr. Belzer, Plaintiff is limited in bending, crawling, lifting more than 20 pounds, standing and walking 50 to 75% of an 8-hour day, and sitting for 45 to 50 minutes at a time up to six hours, she should not climb, and she should not be exposed to chemical fumes or irritants because of asthma.  (TR. 476-477, 479)  He also stated that Plaintiff could ride in a car for an unlimited amount of time.  (TR. 478-479)

Dr. Belzer opined that the dosage of methadone that Plaintiff was taking "would make most people feel tired and weak...lethargic.  However, there is an adjustment to that, and some people work around that level for several months..."  (TR. 478) He stated that he was not in a position to comment regarding Dr. Smith's opinion that Plaintiff would be unable to perform mental functions requiring high levels of concentration due to the methadone.  (Id.)

Dr. Belzer disagreed with FNP-C Russell-Kibble's recommended limitations primarily because they are based on subjective symptoms such as pain, numbness, tingling and Plaintiff does not "have the anatomical things to corroborate those kinds of findings, but it doesn't mean that she doesn't feel them."  (TR. 480) Because Plaintiff's herniated discs did not impinge on the spinal cord or on a nerve, Dr. Belzer opined that the herniation " doesn't quite fit the reason for having the pain."  (TR. 482)

### 2.    Mental

On December 16, 2003, Jack Marks, M.D., determined that Plaintiff had affective disorder, major depression, mild.  (TR. 276) He found that Plaintiff's depression caused mild restriction of activities of daily living and mild to moderate restrictions concerning maintaining social functioning, concentration, persistence or pace.  (TR. 286) He also completed a Mental Residual Functional Capacity Assessment wherein he indicated Plaintiff fell between "not significantly limited" and "moderately limited" regarding her ability to maintain attention and concentration for extended periods.  (TR. 272) He also found that Plaintiff was moderately limited with regard to her abilities to complete a normal work day and work week without interruptions from psychologically based symptoms, interact

appropriately with the public, accept instructions, and respond appropriately to criticism from supervisors. (TR. 273) Dr. Marks indicated that "some depressive indicators present...but [Plaintiff] retains ability to do S[imple] R[eptitive] T[asks] with minimal interpersonal demand." (TR. 274)

On February 4, 2004, nonexamining Dr. Nathan determined that Plaintiff suffered from affective disorders, mild. (TR. 338, 341) He found that Plaintiff was mildly restricted regarding activities of daily living and ability to maintain social functioning and that she was moderately restricted in maintaining concentration, persistence or pace. (TR. 348) He also completed a Mental Residual Functional Capacity Assessment wherein he indicated that Plaintiff was moderately limited regarding her abilities to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal work day and work week without interruptions from psychologically based symptoms, and respond appropriately to changes in the work setting. (TR. 334-335) He concluded that Plaintiff could "recall at least simple instructions" and that Plaintiff could "do at least simple tasks on a sustained basis if special [illegible] not needed" but that she "may need repetition for new routines." (TR. 336) He also found that her social skills were adequate. (Id.)

C.    Lay Testimony

Plaintiff submitted a statement from Mrs. Hamilton, the woman Plaintiff cared for from 1999 to 2004. (TR. 116-123) Mrs. Hamilton states that Plaintiff cries from pain and numbness, requires help with buttoning and zipping her clothes and brushing her hair. (TR. 117) They do the cleaning and laundry together and it takes most of the day. (TR. 118) Plaintiff drives and shops for groceries twice a month. (TR. 119) She is limited in her ability to walk, stand, sit, kneel and has memory problems. (TR. 121) Mrs. Hamilton also stated that Plaintiff cannot lift over 7 pounds. (Id.)

- 16 -

Several other friends submitted statements that driving, sitting and walking for prolonged periods cause Plaintiff pain and numbness to the extent that she cried.  (TR. 138-141)  She is also depressed and forgetful.  (Id.)

> D.      The ALJ's Findings

> 1.      Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process.  20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step requires a determination of whether the claimant is engaged in substantial gainful activity.  20 CFR §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments.  20 CFR §§ 404.1520(c)), 416.920(c)).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id.*  If the ALJ concludes that the impairment is not severe, the claim is denied.  *Id.*  If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.  If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional

capacity ("RFC")[6] to perform past work.   20 CFR §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.   *Id.* However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 CFR §§ 404.1520(f). 416.920(f).  At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).  The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations.  *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.  *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five.  *Desrosiers,* 846 F.2d at 580.

   2. The ALJ's Decision

 In her August 16, 2005 decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant's chronic cervical, thoracic and lumbar pain is a "severe" impairment, based upon the requirements in the Regulations (20 CFR §b416.920).

3. This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

---

[6]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR § 404.1545, 20 CFR 416§945.

5.    The claimant has the following residual functional capacity: lift/carry 10 pounds frequently and 20 pounds occasionally; stand/walk 2 hours 8/hour workday; sit 6 hours/8 hour workday; unlimited push/pull; occasionally climb ramp/stairs, kneel, crouch, crawl and use foot pedals; never climb ladder/rope/scaffolds/step stools; frequently balance, stoop, should avoid concentrated exposure to extreme temperatures, fumes, odors, dusts, machinery; and should avoid all exposure to extreme heights.

6.    The claimant is unable to perform any of her past relevant work. (20 CFR § 416.965).

7.    The claimant is a "younger individual" (20 CFR § 416.963).

8.    The claimant has "a limited education" (20 CFR § 416.964).

9.    The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 416.967).

10.   The claimant has the residual functional capacity to perform substantially all of the full range of sedentary work (20 CFR § 416.967).

11.   Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, Medical-Vocational Rule 201.18, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12.   The claimant's capacity for sedentary work is substantially intact and has not been compromised by any nonexertional limitations.  Accordingly, using the above-cited rule(s) as a framework for decision-making, the claimant is not disabled.

13.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 § 416.920(g)).

## DECISION

It is the decision of the Administrative Law Judge that, based on the application filed on September 3, 2003, the claimant is not eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(TR. 28-35)

In reaching her decision, the ALJ concluded that Plaintiff's "depression is medically determinable, but non-severe" in light of Dr. Campbell's opinion that Plaintiff was "mildly

depressed as a result of the pain she was experiencing" and the fact that Plaintiff was not receiving medications or treatment for depression.  (TR. 29-30)

The ALJ relied on Dr. Belzer's testimony to support her conclusion that Plaintiff had medically determinable, but non-severe asthma, diabetes and fibromyalgia.  (TR. 30) The ALJ accorded greater weight to Dr. Belzer's testimony than to the opinions of Dr. Smith and FNP-C Kibble-Russell   "[b]ased on supportability with medical signs and laboratory findings; consistency with the record; and, area of specialization."  (TR. 30-31)  She stressed that Plaintiff did not see Dr. Smith frequently, Dr. Smith questioned Plaintiff's veracity, and the conservative treatment administered was "inconsistent with the medical response that would be expected if the symptoms and limitations were as severe as described" in Dr. Smith's and FNP-C Kibble-Russell's statements.  (TR. 30)

Additionally, the ALJ found that Plaintiff's allegations regarding her symptoms and resulting limitations were not fully credible.  (TR. 32)

III.     CROSS-MOTIONS FOR SUMMARY JUDGMENT

A.     Argument

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ erroneously evaluated Plaintiff's depression, mischaracterized the medical evidence, made errors when determining Plaintiff's RFC, and erroneously credited Dr. Belzer's testimony over Dr. Smith's opinion.

Defendant contends that any error with respect to Plaintiff's depression is harmless and Plaintiff's multiple objections to the ALJ's RFC determination and weight given to Dr. Smith's opinion are untenable.

B.     Standard of Review

An individual is entitled to Title XVI Supplemental Security Income disability benefits (hereinafter "SSI") if the individual meets certain eligibility requirements and demonstrates the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 1381(a), 1382c(a)(3)(A).  "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'"  *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).  Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error."  *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision.  *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)).  Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988).  However, substantial evidence is less than a preponderance.  *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.*  However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v.*

*Weinberger*, 522 F.2d 1154 (9th Cir. 1975).  Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion.  *Id*. at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability.  *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or nonexamining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record.  *Magallanes,* 881 F.2d at 751.  Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so.  *Magallanes*, 881 F.2d at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner.  *Magallanes,* 881 F.2d at 751 (citations omitted).  However, the Commissioner's finding that a claimant is less than credible must have some support in the record.  *See  Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

C.     Discussion

1.     Plaintiff's Depression

Plaintiff's argument focuses on the ALJ's determinations made at steps two and five of the disability evaluation analysis.  At step two, the ALJ determined that although Plaintiff's "chronic cervical, thoracic, and lumbar pain is a 'severe' impairment...", Plaintiff's depression was not a "severe" impairment. (TR. 30) Thus, the ALJ did not consider Plaintiff's depression in the remainder of the five-step disability analysis.

At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work.  (TR. 34) When a claimant establishes that she suffers from a severe impairment that

prevents her from doing her past relevant work, she "has made a prima facie showing of disability" and the analysis moves to step five of the disability determination process. *Tackett v. Apfel,* 180 F.3d 1094, 1100 (9th Cir. 1999). *See also* 20 C.F.R. §416.920(g). At step five, the Commissioner has the burden "to show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id. See also* 20 C.F.R. §416.920(g).

There are two ways the Commissioner can meet the burden of showing that there is other work in significant numbers that the claimant can perform: (1) by the testimony of a vocational expert; or (2) by reference to the Medical-Vocational Guidelines, *i.e.* the grids, at 20 C.F.R. pt. 404, subpt, P, app. 2. *Tackett,* 180 F.3d at 1100-1101. In this case, the ALJ did not call a vocational expert to testify but instead relied on the grids to determine that Plaintiff was not disabled. "The ALJ may rely on the grids alone to show the availability of jobs for the claimant 'only when the grids accurately and completely describe the claimant's abilities and limitations.'" *Id.* (*quoting Jones v. Heckler,* 760 F.2d 993, 998 (9th Cir. 1985)). The grids "'provide for the evaluation of claimants asserting both exertional and non-exertional limitations.[7]" *Hoopai v. Astrue,* 499 F.3d 1071, 1075 (9th Cir. 2007) (*quoting Razey v. Heckler,* 785 F.2d 1426, 1430 (9th Cir. 1986), *amended* 794 F.2d 1348 (9th Cir. 1986)). *See also Tackett,* 180 F.3d at 1102 ("the fact that a non-exertional limitation is alleged does not automatically preclude application of the grids." ) However, "the grids are inapplicable '[w]hen a claimant's non-exertional limitations are 'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's exertional limitations.'" *Hoopai,* 499 F.3d at 1075 (*quoting Burkhart v. Bowen,* 856 F.2d 1335, 1340 (9th Cir. 1988)). Therefore, the ALJ should first determine whether claimant's non-exertional limitations

---

[7]"A non-exertional impairment is an impairment 'that limits [the claimant's] ability to work without directly affecting his [] strength.'" *Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir. 2001) (*quoting Desrosiers,* 846 F.2d at 579)).

significantly limit the range of work permitted by her exertional limitations. *Tackett,* 180
F.3d at 1102 (citation omitted).

Plaintiff contends that the ALJ erroneously determined that Plaintiff's depression was
not severe.

Once a claimant has demonstrated that she is not engaged in substantial gainful
activity, the ALJ must proceed to step two to determine whether the claimant has a medically
severe impairment or combination of impairments significantly limiting her from performing
basic work activities. 20 C.F.R. § 416.920(c). Under the regulations, "an impairment or
combination of impairments is not severe if it does not significantly limit your physical or
mental ability to do basic work activities." 20 C.F.R. § 416.921(a). *See also Bowen v.
Yuckett,* 482 U.S. 137 (1987) (at step two, the Commissioner makes an initial determination
of medical severity without consideration of the claimant's age, education, and experience);
SSR 96-3p (an impairment is "not severe" when medical evidence establishes only "a slight
abnormality (or a combination of slight abnormalities) that has no more than a minimal effect
on the ability to do basic work activities.") Basic work activities are "the abilities and
aptitudes necessary to do most jobs" such as walking, standing sitting and other physical
functions, understanding, carrying out and remembering simple instructions; use of
judgment; responding appropriately to supervisors, co-workers and usual work situations;
and dealing with changes in a routine work setting. 20 C.F.R. § 416.921(c).

The step-two inquiry is a *de minimus* screening device to dispose of groundless
claims. *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996). "The regulations guiding the
step-two determination of whether a disability is severe is merely a threshold determination
of whether the claimant is able to perform his past work. Thus, a finding that a claimant is
severe at step two only raises a prima facie case of a disability." *Hoopai,* 499 F.3d at 1075.

The ALJ relied on examining Dr. Campbell's December 5, 2003 opinion to find that
Plaintiff's depression was not severe as follows:

> [Plaintiff's] memory was not considered a problem and she was mildly depressed as a result of the pain she was experiencing.  Judgment was adequate and she reported no difficulties in relationships.  Concentration did not appear to be a problem and she handled stress adequately.  At that time, the claimant was not getting psychiatric or psychological treatment.  The diagnosis included major depressive disorder, single episode, mild...At the hearing, the claimant testified that she is not receiving any medications or treatment for her depression.   The undersigned concludes that the claimant's depression is medically determinable, but not severe.

(TR. 29-30) Dr. Campbell also stated in his report that Plaintiff "could concentrate for two hours at a time on simple and detailed tasks."  (TR. 268)

Plaintiff points out that nonexaminingining Doctors Marks and Nathan limited her to simple repetitive tasks.  (Plaintiff's MSJ, p. 8)    Specifically, Dr. Marks stated in his December 2003 report that Plaintiff "retains the ability to do S[imple] R[epetitive] T[asks] with minimal interpersonal demand."  (TR.  274) Dr. Marks' December 16, 2003 report was completed within two weeks after Dr. Campbell's December 5, 2003 report. Dr. Marks does not mention Dr. Campbell's report.  Dr. Nathan stated in his February 4, 2004 report that Plaintiff "[c]an do at least simple tasks on a sustained basis if [illegible] not needed...[m]ay need repetition for new routines."  (TR. 336)  Dr. Nathan indicated that Dr. Campbell's December 5, 2003 consultative examination showed that Plaintiff was friendly, slightly depressed, logical, and was diagnosed as "[m]ajor [d]epressive [d]isorder, mild....M[edical] E[vidence] of R[ecord] is consistent and fails to substantiate significant depression or memory [illegible]."  (TR. 350)

The parties agree that the ALJ did not discuss the nonexaminingining doctors' opinions concerning Plaintiff's mental functioning.  Plaintiff takes issue this omission.

"The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  SSR 96-6p. The regulations are clear that "[u]nless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating

sources, nontreating sources, and other nonexamining sources who do not work for us." 20 C.F.R. § 416.927(f)(2)(ii).  Generally, the conclusion of a nonexamining physician is entitled to less weight than the conclusion of an examining physician.  *Andrews v. Shalala,* 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Pitzer v. Sullivan,* 908 F.2d 502, 506 n.4 (9th Cir. 1990)); 20 C.F.R. § 416.927(d)(1)).  "However, giving the examining physician's opinion *more* weight than the nonexamining expert's opinion does not mean that the opinions of nonexamining sources...are entitled to *no* weight."  *Andrews,* 53 F.3d at 1041 (emphasis in original).  *See also* SSR 96-6P (The ALJ "and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.")  In contravention of the regulations, the ALJ failed to address the opinions of the nonexamining doctors.

Defendant argues that such error is harmless given that both doctors concluded Plaintiff could work and given that the ALJ limited Plaintiff to unskilled work.[8] (Defendant's XMSJ, p.6)  The Ninth Circuit has deemed an ALJ's error harmless where such error was inconsequential to the ultimate nondisability determination.  *See Stout v. Commissioner of Social Security,* 454 F.3d 1050, 1055 (9th Cir. 2006).  Plaintiff argues that had the ALJ considered and adopted the nonexamining doctors' reports, the ALJ would have concluded that Plaintiff's depression was severe at step two resulting in consideration of Plaintiff's depression/mental functioning during the remainder of the sequential evaluation including Plaintiff's RFC assessment and the necessity of vocational expert testimony at step five.

Generally, "satisfaction of the step-two threshold requirement that a claimant prove her limitations are severe is not dispositive of the step-five determination of whether the non-

---

[8]"Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 416.968(a).

exertional limitations are sufficiently severe such as to invalidate the ALJ's exclusive use of the grids without the assistance of a vocational expert.  Instead, an ALJ is required to seek the assistance of a vocational expert when the non-exertional limitations are at a sufficient level of severity such as to make the grids inapplicable to the particular case."  *Hoopai,* 499 F.3d at 1076.  Plaintiff is correct that the ALJ's conclusion at step two that Plaintiff's depression was not severe prevented later consideration as to whether Plaintiff's limitations of mental functioning were sufficiently severe so as to make the grids inapplicable at step five.

The record contains evidence that could support Dr. Marks' and Dr. Nathan's assessment.  Subsequent to their reports, Dr. Smith wrote in November 2004 that Plaintiff "would be unable to perform mental functions which require high levels of concentration because the methadone definitely slows her thinking."  (TR. 386) Nonexamining Dr. Belzer testified that based on Dr. Smith's November 2004 letter, Dr. Smith did "not think [Plaintiff] could" perform simple repetitive tasks.  (TR. 478)  Dr. Belzer further testified that based on his review of the record prior to Dr. Smith's November 2004 letter, he believed that Plaintiff could perform simple, repetitive tasks but based on the November 2004 letter, he did not believe Plaintiff could perform such tasks.  (Id.)  Although Dr. Campbell, Dr. Marks, and Dr. Nathan issued their reports eleven months or more after Plaintiff had started taking methadone, the doctors do not specifically discuss side-effects associated with that medication.  The ALJ may reject the opinion of an examining doctor in favor of the opinion of a nonexamining doctor when the reports of the nonexamining doctor are supported by other evidence in the record and are consistent with it.  *Andrews,* 53 F.3d at 1041; *see also* SSR 96-6p (in appropriate circumstances, opinions from nonexamining doctors may be entitled to greater weight than the opinions of treating or examining doctors).  Dr. Smith opined, as interpreted by Dr. Belzer, that Plaintiff could *not* perform simple, repetitive tasks.  Whereas, Dr. Marks and Dr. Nathan restrict Plaintiff to such tasks.  Despite this difference, Dr. Smith's and Dr. Belzer's statements concerning the side-effects of mehtadone on

Plaintiff's mental functioning lends support to Dr. Marks' and Dr. Nathan's statements that Plaintiff's mental functioning is limited. Thus, the reports raise an unanswered question in the record as to Plaintiff's level of mental functioning. Nor does, as Defendant argues, the limitation to "unskilled" work render omission of this issue harmless given that Defendant provides no authority to support the proposition that a limitation to simple*, repetitive* tasks has no significant effect on the occupational base for unskilled jobs.

The fact that Dr. Smith expressed his opinion almost one year afer the nonexamining physicians issued their reports goes to the weight of the opinions which must be addressed in the first instance by the ALJ. Depending on the weight the ALJ attributes to Dr. Marks' and Dr. Nathan's reports in light of the record as a whole, Plaintiff's mental impairment could factor into the analysis in a myriad of ways beginning at step two and following steps, including determination of Plaintiff's RFC and the necessity of testimony from a vocational expert at step five. Or, it may well be that consideration of the reports will not have any affect on the outcome of Plaintiff's case. *See e.g. Hoopai,* 499 F.3d at 1077 (finding in case not involving limitation to simple, repetitive tasks that the ALJ was not required to call a vocational expert where the claimant had mild or moderate depression). Consequently, under such circumstances, it cannot be said that the ALJ's failure to discuss Dr. Mark's and Dr. Nathan's opinions, as required by the regulations, was inconsequential to the ultimate nondisability determination. *See e.g. Stout,* 454 F.3d at 1055-1056.

2.      RFC Finding

In assessing Plaintiff's RFC, the ALJ determined that Plaintiff could perform a range of work that fell between light and sedentary work. (TR. 32); *see also* 20 C.F.R. § 416.967(a),(b) (defining light and sedentary work). Based on that RFC, the ALJ found that Plaintiff had the capacity to perform substantially all of the full range of sedentary work. (TR. 34) "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia,* medical records, lay evidence, and 'the effects of symptoms,

including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Social Security Admin.,* 466 F.3d 880, 883 (9ᵗʰ Cir. 2006) (*quoting* SSR 96-8p).

Plaintiff argues that the ALJ erred when determining Plaintiff's RFC because the ALJ improperly rejected treating Dr. Smith's opinion regarding side effects from medication, misstated the medical evidence, improperly assessed Plaintiff's treatment, and did not account for several restrictions supported in the record.

a.    Side-effects of medication

"The ALJ must consider *all factors* that might have a 'significant impact on an individual's ability to work.'" *Erickson v. Shalala,* 9 F.3d 813, 817 (9ᵗʰ Cir. 1993) (emphasis in original) *(quoting Varney v. Secretary of HHS,* 846 F.2d 581, 585 (9ᵗʰ Cir.), *relief modified,* 859 F.2d 1396 (9ᵗʰ Cir. 1988)).   The Ninth Circuit has recognized that "the side-effects of medications can have a significant impact on an individual's ability to work and should figure in the disability determination process." *Varney,* 846 F.2d at 585.  *See also Orteza v. Shalala,* 50 F.3d 748, 750 (9ᵗʰ Cir. 1995) ("Factors an adjudicator may consider when making...credibility determinations include ...adverse side effects of any pain medication,..."); 20 C.F.R. § 416.929(c)(3)(iv) ("Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information...includ[ing]...[t]he type, dosage, effectiveness and *side effects* of any medication you take or have taken to alleviate your pain or other symptoms...") (emphasis added); SSR 96-8p (side effects of medication must also be considered when determining a claimant's RFC).

Plaintiff began taking methadone for pain in January 2003.  (TR. 199) In November 2004, Dr. Smith wrote that Plaintiff "would be unable to perform mental functions which require high levels of concentration because the methadone definitely slows her thinking." (TR. 386)

When asked about side effects of medication, Dr. Belzer testified that Plaintiff was taking 100 milligrams of methadone which "is quite a bit...on one hand it...would make most

- 29 -

people feel tired and weak...lethargic.  However, there is an adjustment to that, and some people work around that level for several months...do not have a slowing...But I see he [Dr. Smith] thinks that...she would be unable to perform mental functions which require high levels of concentration, but I'm not aware if that was ever tested....I'm really not in a position to comment on that accurately."  (TR. 478; *see also* TR. 482-483)  Dr. Belzer also testified that Dr. Smith's November 2004 letter indicates Dr. Smith's belief that Plaintiff was unable to perform simple, repetitive tasks.  (TR. 478)  Dr. Belzer opined that Plaintiff could perform simple, repetitive tasks "based on other things that I've...read...but not based on this letter." (Id.)

Plaintiff testified that side effects of medication included fatigue and memory loss. (TR. 488)

The ALJ discussed the side effects of Plaintiff's medication as follows:

> Dr. Belzer testified that he does not agree with the pain assessment given...by Dr. Donald Smith.  He notes that claimant was taking 100 mg of Methadone on a daily basis and stated  that such a large amount could make most people weak and tired, although some people do adjust.  Dr. Smith himself notes that the claimant overstates her symptoms and exaggerates her reactions when it comes to pain....He [Dr. Belzer] feels that the claimant is capable of performing sedentary work activities on a sustained basis.

(TR. 30-31)

Plaintiff argues that the ALJ improperly accepted Dr. Belzer's testimony over Dr. Smith's testimony given that "Dr. Belzer stated that he was 'not really in a position to comment...accurately' on whether in fact medication affected [Plaintiff's] mental functioning."  (Plaintiff's MSJ, p. 6 (quoting TR. 478))  Because Dr. Smith mentioned that Plaintiff was prone to exaggerate in the same letter wherein he included functional limitations due to the side effects of the methadone, Plaintiff also argues that the ALJ was mistaken in relying on Dr. Smith's comment.  According to Plaintiff, Dr. Smith "took into account any such tendency when describing [Plaintiff's] functional limitations."  (Plaintiff's MSJ, p. 6 n.3)

- 30 -

The ALJ recited Dr. Belzer's testimony about the side-effects of Plaintiff's medication in general, i.e., that the medication could make a patient feel weak and tired.  As to Plaintiff in particular, Dr. Belzer testified that he could not comment although prior to reading Dr. Smith's November 2004 letter, he felt Plaintiff could perform simple repetitive tasks; but, based on that letter, Dr. Belzer did not think she could perform such tasks.  Thus, the ALJ's discussion concerning the side effects of medication does not address either Dr. Belzer's or Dr. Smith's statements concerning the level of Plaintiff's mental functioning.  Further, as discussed *supra*, the issue of Plaintiff's mental functioning remains unresolved at step two.  Until Plaintiff's level of mental functioning is resolved, it is unclear whether the ALJ's determination that Plaintiff can perform unskilled work accounts adequately for the side-effects of Plaintiff's medication.

However, it was not improper for the ALJ to refer to Dr. Smith's observation that Plaintiff was prone to exaggerate.  If the ALJ decides to disregard a claimant's testimony as to the subjective limitations of side-effects, then the ALJ must support that decision with specific findings similar to those required for excess pain testimony, as long as the side-effects are in fact associated with the claimant's medications.  *Varney,* 846 F.2d at 585.  However, the ALJ "is not obliged to adopt physicians' reports of side-effects that merely reflected plaintiff's subjective complaints."  *Soria v. Callahan,* 16 F.Supp.2d 1145, 1154 (C.D. Calif. 1997) (citations omitted).  Herein, when considering the issue of side effects, the ALJ discounted Plaintiff's credibility by relying on treating Dr. Smith's statement that Plaintiff "overstates her symptoms and exaggerates her reactions when it comes to pain." (TR. 30)  The ALJ properly considered treating Dr. Smith's observation to discount Plaintiff's credibility.   *See e.g. Smolen,* 80 F.3d at 1284 (In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying and observations of treating and examining physicians).  This finding alone, however, does not render the issue of side-effects moot in light of unresolved questions in the record concerning Plaintiff's level of mental functioning.

- 31 -

b.     The ALJ's assessment of the medical evidence

The RFC determination must include consideration of the objective medical evidence. *Robbins,* 466 F.3d at 883. Plaintiff argues that the ALJ mischaracterized the objective medical evidence when she stated that Plaintiff's

> pain level is not supported by the objective medical evidence of record.  The medical expert [Dr. Belzer] and the orthopedist Dr. Mar...note that MRIs show no compression, only *mild* stenosis, and conservative treatment is recommended.

(TR. 32) (emphasis added) The ALJ made this statement when assessing Plaintiff's credibility and relied on same in part to find that Plaintiff's allegations concerning pain and resulting limitations were not fully credible.

The parties agree that on direct examination, Dr. Belzer did not characterize the degree of Plaintiff's stenosis shown in the MRIs.  (Plaintiff's MSJ, p. 3; Defendant's XMSJ, p. 4) Dr. Belzer testified on cross-examination that Plaintiff had "bilateral severe foraminal stenosis at L-5, S-1."  (TR. 482)

> Plaintiff points out that Dr. Mar's summary of Plaintiff's MRIs includes that
>
> [t]he spinal canal shows *moderate* spinal stenosis.  At L4-5 the spinal canal is narrow mildly on a developmental basis.  At L5-S1 the spinal canal is narrow mildly on a developmental basis as well.  The report on the MRI scan by Dr. Trief[9] notes L3-4 *mild to moderate* stenosis, L4-5 *mild to moderate stenosis*, L5-S1 mild stenosis.

(TR. 431) (emphasis added) Additionally, Dr. Mar's impression included "L3-4 *moderate* central spinal stenosis."  (Id.) (emphasis added)

Defendant argues that Plaintiff did not have spinal cord impingement and that "[w]hether or not Plaintiff's stenosis was 'mild' or 'moderate' is immaterial since no doctor found significant correlating clinical findings such as weakness, sensation deficits or significant range of motion limitations."  (Defendant's XMSJ, p. 4 (footnote omitted)) However, Plaintiff persuasively points out that the ALJ found the degree of stenosis was

---

[9]Dr. Trief was the radiologist who originally reported the MRI findings. (TR. 310-312)

probative given that the ALJ cited "only mild stenosis" as a factor to support her credibility finding.  (*See* Plaintiff's Reply, pp. 3-4) Plaintiff also points out that  "[a] reasonable ALJ, when considering evidence of mild-to- moderate, moderate, and severe stenosis, could conclude that such abnormalities could cause the pain Valenzuela described."  (Id. at p.4)

While subjective pain testimony cannot be rejected solely on the ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.  *Rollins v. Massanari,* 261 F3d. 853, 857 (9th Cir. 2001) (*citing* 20 CFR § 404.1529(c)(2)). *See also Reddick,* 157 F.3d at 723 ("Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." );  SSR 96-7p ("Symptoms cannot be measured objectively through clinical or laboratory diagnostic techniques..."). Instead, "the absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence."  SSR 96-7p.  Thus, an ALJ's credibility determination cannot be based solely on objective medical evidence. The degree of stenosis was not the only reason given by the ALJ to discount Plaintiff's pain testimony.  The ALJ also cited Dr. Smith's statement that Plaintiff was prone to overstating her symptoms and exaggerating her pain and Plaintiff's daily activities which the ALJ found were inconsistent with Plaintiff's allegation of inability to work.  Nonetheless, the fact that the ALJ herein misstated the medical evidence is troubling and it is unclear to what degree the ALJ relied on the mistaken belief that Plaintiff suffered  from only mild stenosis in assessing Plaintiff's credibility in particular and in considering the medical evidence as a whole when determining Plaintiff's RFC.

<u>c.      Treatment</u>

Plaintiff challenges the ALJ's finding that she was not credible in part because her medical treatment was "limited and conservative...." (Plaintiff's MSJ, p. 4 (*quoting* TR. 31); *see also* TR. 32) Plaintiff argues that the ALJ's finding was improper because Plaintiff's obesity prevented her from receiving more than conservative treatment such as surgery.

In August 2004, Dr. Mar, who examined Plaintiff on referral from Dr. Smith, concluded in pertinent part that Plaintiff

> is not a good surgical candidate.  It does not appear that she has any compression that would be amenable to surgical remediation...She has some degenerative disc with bulging at T2-T3 and she has some spinal stenosis of the lumbar spine, but at this point it does not really appear to be surgical. The patient is encouraged to lose some weight.  I would suggest that she see a dietician for consideration of diet control.  If she were to lose some weight if she had persistence of pain and she had severe, unremitting pain, then consideration would be given for further evaluation and treatment recommendations.

(TR. 431-432)

> In February 2005, neurologist Dr. Henricks concluded in pertinent part that Plaintiff

> is an obese woman with significant multi-level disc disease associated with radicular symptoms.  However, she is too obese to undergo surgery at this time.  She will be referred for neurosurgical evaluation, however.  We discussed weight loss and pain management.

(TR. 427)

Although both doctors noted Plaintiff's obesity, neither indicated that Plaintiff required surgery or would be a surgical candidate except for her obesity.  Despite Plaintiff's obesity, Dr. Henricks in fact referred Plaintiff for a neurosurgical evaluation anyway. Further, Dr. Mar specifically found that Plaintiff did not have "any compression that would be amenable to surgical remediation." (TR. 431)  Consequently, substantial evidence in the record supports the ALJ's conclusion on this issue.

d.     Other restrictions: balancing, climbing, exposure to irritants and
alternating between sitting and standing

The ALJ determined that Plaintiff could balance "frequently." (TR. 32)  Treating Dr.

Smith indicated that Plaintiff should "never" balance due to her multi-level disc disease.

(TR. 362) Nonexamining doctor Gonzales-Portillo indicated in December 2003 that Plaintiff

could "occasionally" balance, i.e., less than one third of the workday.   (TR. 292)

Nonexamining Dr. Estes indicated in August 2004 that Plaintiff could balance "frequently,"

i.e., from one-third to two thirds of the workday.   (TR. 367)   Dr. Belzer did not discuss

Plaintiff's ability to balance.   Plaintiff argues that the ALJ failed to account for Dr. Smith's

opinion that Plaintiff should never balance and the ALJ also failed to identify the conditions

under which Plaintiff could frequently balance.

The ALJ expressly credited Dr. Belzer's testimony over Dr. Smith's statements.  (TR.

31) However, Dr. Belzer's testimony neither supports nor contradicts Dr. Smith's assessment

that Plaintiff should never balance.   The ALJ did not discuss the reports prepared by Dr.

Gonzalez-Portillo and Dr. Estes or the weight given to those opinions. Because the ALJ's

finding is consistent with Dr. Estes' opinion, she may have relied on his opinion.   However,

as discusses *supra,* "[t]he opinion of a nonexamining physician cannot by itself constitute

substantial evidence that justifies the rejection of the opinion of either an examining *or*

treating physician." *Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1995) (emphasis in original).

Instead, the ALJ must state specific and legitimate reasons for rejecting Dr. Smith's opinion

and accepting Dr. Estes' opinion. *Id.*   Even if the ALJ's reasons for crediting Dr. Belzer's

testimony over Dr. Smith's opinion  could be applied to support the ALJ's decision to credit

Dr. Estes' testimony, there is still a discrepancy between the nonexamining, non-testifying

doctors' opinions as to whether Plaintiff could balance frequently or only occasionally which

is not accounted for.   Thus, the substantial evidence of record does not support the ALJ's

finding concerning Plaintiff's ability to balance.  Because the evidence of record does not

support the conclusion that Plaintiff could frequently balance, the Court does not address

Plaintiff's argument that the ALJ failed to identify the conditions when Plaintiff could balance.

Plaintiff argues that Dr. Belzer agreed with Plaintiff's treating sources that she should not climb.  Yet, the ALJ found that while Plaintiff should never climb ladders, ropes, scaffolds, or step stools, she could occasionally climb stairs and ramps.  (TR. 32) Dr. Belzer testified that "because of the weight problem she should not be climbing, so she certainly should not work up on ladders or stepstools."  (TR. 477) He also agreed with FNP-C Russell-Kibble's assessment that Plaintiff could not climb stairs or ladders.  (TR. 479; *see also* Tr. 305)[10] Nonexamining doctors Gonzales-Portillo and Estes indicated that Plaintiff should never climb ladders, ropes or scaffolds but could occasionally climb ramps and stairs.  (TR. 292, 367).  Likewise, although Dr. Belzer testified that he agreed with Plaintiff's treating physician that she "should not be exposed to chemical fumes or irritants because of her asthma" (TR. 477), the ALJ, who adopted Dr. Belzer's testimony, instead determined that Plaintiff  "should avoid concentrated exposure to extreme temperatures, fumes, odors, dusts, gases, machinery..."  (TR. 34)   Dr. Gonzales-Portillo indicated that Plaintiff had no limitations regarding such exposure except she should avoid concentrated exposure to machinery.[11]  (TR. 294) Dr. Estes stated that Plaintiff should "avoid concentrated exposure" to extreme cold or heat, fumes, odors, dusts, machinery, and should "avoid all exposure" to extreme heights.  (TR. 369) The ALJ's RFC finding reflected nonexamining doctors Estes' opinion instead of Dr. Belzer's.   Because the ALJ failed to discuss the weight attributed to

---

[10]Defendant attempts to limit Dr. Belzer's testimony to the climbing of ladders but the record does not support that proposition.  FNP-C Russell-Kibble clearly marked that Plaintiff could not climb stairs or ladders. (TR. 305)  Dr. Belzer, without expressing any limitation, testified that he agreed with FNP Russell-Kibble's assessment that Plaintiff "shouldn't climb."  (TR. 479)

[11]Among the choices available to Dr. Gonzales-Portillo were avoid concentrated exposure, avoid even moderate exposure, or avoid all exposure.  (TR. 294)

nonexamining doctors Gonzales-Portillo's and Estes' opinions there is no support in the record for accepting their opinions over Dr. Belzer's more restrictive finding.

Dr. Smith indicated that Plaintiff needed to change positions from sitting to standing every thirty to sixty minutes (TR. 362) Nonexamining doctors Gonzales-Portillo and Estes found that Plaintiff did not need to alternate between sitting and standing.  (*See* TR. 291, 366) Dr. Belzer's testimony did not address the issue. The ALJ's RFC finding does not include the restriction that Plaintiff must alternate between sitting and standing.  The ALJ is required to set forth sufficient findings to support the RFC determination.  *See Pinto v. Massanari,* 249 F.3d 840 (9th Cir. 2001).   That was not done here.  Depending how these issues are resolved, vocational expert testimony may be required at step five.  *See e.g., Allen v. Secretary of Health & Human Servs.,* 726 F.2d 1470 (9th Cir. 1984) ("We have held that a remand is necessary where the ALJ applies the guidelines without considering the restrictions on available jobs caused by the claimant's inability to tolerate dust or fumes in the work environment."); *Hoopai,* 499 F.3d at 1076 ("a vocational expert is required only when there are significant and 'sufficiently severe' non-exertional limitations not accounted for the grid.");  SSR 83-14 (clarifying how the grids provide a framework for decisions concerning claimants who have both a severe exertional impairment and a nonexertional limitation or restriction); SSR 96-6p (discussing exertional and nonexertional limitations on a claimant's ability to do less than a full range of sedentary work and when vocational expert testimony might be required).

3.     Medical Opinions

Plaintiff argues that the ALJ improperly attributed more weight to Dr. Belzer's opinion than to Dr. Smith's opinion.    The ALJ credited Dr. Belzer's testimony over Dr. Smith's opinion

> based on supportability with medical signs and laboratory findings; consistency with the record; and area of specialization.  The medical expert based his findings on the objective evidence of record and the residual functional capacities of the treating physician (and nurse practitioner) are not entitled to controlling weight.  The claimant does not see Dr. Smith frequently

> and Dr. Smith questions the veracity of the claimant.  The residual functional capacities [by the treating sources]...are too restrictive in light of the objective evidence and treating notes.  The claimant's relevant medical records show that the treating physician(s) responded with limited and conservative treatment.  Such treatment is inconsistent with the medical response that would be expected if the symptoms and limitations were as severe as described in...[the residual functional capacity assessments]."

(TR. 31)

Plaintiff contends that Dr. Belzer's testimony is undercut by his statements that he did not have a good sense of Plaintiff's level of pain.  (TR. 478)  Dr. Belzer also pointed out that Plaintiff had no impairment of the spinal cord and he opined that "usually you do have cord impingement to actually cause the pain."  (TR. 481)  Thus, according to Plaintiff, "[b]ecause pain is [her] main medical problem, Dr. Belzer's testimony is owed less weight for the reason that he did not know how much pain [she] experienced."  (Plaintiff's MSJ, p. 12)  Plaintiff also argues that Dr. Belzer's testimony is incorrect as a medical matter because Plaintiff's spinal stenosis without cord impingement could in fact cause pain.

The ALJ never concluded that Plaintiff did not experience pain.  The degree of pain Plaintiff experienced and the effect of that pain on Plaintiff's ability to work primarily turns upon evaluation of Plaintiff's credibility.  The ALJ determined that Plaintiff's allegations of pain were "not fully credible."  (TR. 32)  She did this by evaluating the objective medical evidence, Plaintiff's treatment history, Dr. Smith's statements in the record, and Plaintiff's daily activities.[12]  (Id.)  It may be true that an ALJ's improper credibility determination can in some cases undercut the reasons given by the ALJ for discounting a treating doctors' opinion, that is not the case here.  In discounting Dr. Smith's opinion, the ALJ did not cite her own finding that Plaintiff was less than credible, but instead relied upon Dr. Smith's own statements questioning Plaintiff's veracity.  (TR. 31)  However, the ALJ's misstatement of

---

[12]The fact that the ALJ misstated the evidence concerning the degree of Plaintiff's stenosis when evaluating Plaintiff's credibility is discusses *supra* pp. 32-33.

the medical evidence, discussed *supra* pp. 32-33, may impact her decision to credit Dr. Belzer's testimony over Dr. Smith's.

Plaintiff challenges the ALJ's decision to credit Dr. Belzer's testimony for the reason that Dr. Belzer's area of specialization is not specified in the record despite the ALJ's reference to his expertise.  At the outset of her opinion, the ALJ stated that Dr. Belzer was board certified in internal medicine.  (TR. 28)  Dr. Belzer's curriculum vitae is in the record. (TR. 92) Although Plaintiff's counsel had an opportunity to question Dr. Belzer, counsel did not explore his area of specialization. On the instant record, the omission of Dr. Belzer's area of specialization does not undercut the ALJ's other findings supporting her decision to credit his testimony.

To support her argument that the ALJ improperly rejected Dr. Smith's opinion, Plaintiff also argues that the ALJ failed to adequately assess Plaintiff's course of treatment and to account for whether Plaintiff must alternate between sitting and standing.   These issues are discussed *supra* pp. 35-37.

IV.   CONCLUSION

Plaintiff requests that the Court remand the matter for an immediate award of benefits or, in the alternative, remand for further proceedings including the testimony of a vocational expert.  Remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke v. Barnhart ,* 379 F.3d 587,  593 (9th Cir. 2004) (citations omitted).  Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester,* 81 F.3d at  834.

As discussed above, the ALJ failed to discuss the weight given to reports from the nonexamining doctors concerning Plaintiff's mental functioning which may affect Plaintiff's

RFC determination, including but not limited to consideration of the side effects of Plaintiff's medication on Plaintiff's mental functioning, and ultimately whether testimony from a vocational expert is necessary. The ALJ also failed to set forth legally sufficient reasons for accepting in part the findings of nonexamining doctors Gonzales-Portillo and Estes over Dr. Belzer and Dr. Smith which in turn may affect the ALJ's RFC determination and the necessity of testimony of a vocational expert. Additionally, the ALJ also misstated the medical evidence and this mistake may also impact the RFC and credibility determinations, and the weight given to Dr. Smith's opinion. *See e.g.*, Bunnell v. Barnhart, 336 F.3d 1112, 1115-1116 (9th Cir. 2003) (remanding where outstanding issues, including ALJ's reassessment of plaintiff's credibility, must be resolved before a disability determination can be made). Reassessment of the RFC determination may or may not require testimony from a vocational expert and may or may not affect whether the Commissioner has met his burden of showing the existence of other work in significant numbers that Plaintiff can perform. Because outstanding issues must be resolved before a determination of disability can be made, remand for an award of benefits is not warranted. The matter should be remanded for further proceedings including testimony from a vocational expert if necessary.

V.     RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court:

(1)     grant in part and deny in part Plaintiff's Motion for Summary Judgment (Doc. No. 10)  The Motion should be granted to the extent that Plaintiff seeks remand for further proceedings. The Motion should be denied to the extent Plaintiff seeks remand for an immediate payment of benefits.;

(2)     deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 11); and

(3)     remand this matter for further proceedings consistent with this Report and Recommendation.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: CV 06-249-TUC-FRZ. A party may respond to another party's objections within ten days after being served with a copy thereof. *See* Fed.R.Civ.P. 72(b).

If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived. *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 22nd day of January, 2008.


_____
Héctor C. Estrada
United States Magistrate Judge